***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence affirms the Award, but modifies the findings of fact and conclusions of law of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties through a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. The Plaintiff was an employee of Hickory Furniture Co. on or about August 2, 2006.
3. The parties are properly before the Commission and the Commission has jurisdiction over the parties and over the subject matter.
4. It is stipulated that all parties have been correctly designated and that there is no question as to misjoinder or nonjoinder of the parties.
5. The issues before the Commission are as follows:
 a) Did the Plaintiff sustain an injury by accident or occupational disease arising out of and in the course and scope of his employment with the Defendant-Employer on or about August 2, 2006?
 b) If so, to what benefits is he entitled?
 c) What is the Plaintiff's correct average weekly wage?
 *********** EXHIBITS
6. The following exhibits were admitted into evidence:
 a) Stipulated Exhibit No. 2-medical records, I.C. forms, discovery responses.
 b) Plaintiff's Exhibit No. 1-National Weather Service daily summary.
 ***********
Based upon all of the competent and credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT *Page 3 
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was 55 years old. Plaintiff completed the tenth grade in Mexico and his ability to speak and understand English is limited.
2. Plaintiff began working as a temporary employee for Defendant-Employer in April 2006 and became a permanent employee in July of 2006. Plaintiff's job as a furniture dryer, required him to stand near a conveyor belt and dry various pieces of furniture as they came off the assembly line.
3. After becoming a permanent employee, Plaintiff earned $10.00 per hour and worked 32 hours per week. He worked from 7:00 in the morning until 3:30 in the afternoon. By August 2, 2006, Plaintiff had become accustomed to his job duties and the temperature of the work environment.
4. As Plaintiff worked throughout the morning on August 2, 2006, he was sweating, but during the first 4½ hours, he only drank water during his allotted 10-minute break. As the morning progressed, Plaintiff continued to sweat and subsequently began to experience some dizziness. Plaintiff was performing his job in the normal and usual manner.
5. Around mid-day, Plaintiff was allowed a thirty-minute break, during which he ate his lunch and drank more water. Despite the existence of an air-conditioned break room, Plaintiff never used the room, opting to eat lunch on the factory floor.
6. After lunch, Plaintiff resumed working and he experienced a sudden syncopal episode. He passed out and struck his forehead on one of the carts as he fell onto the floor, causing a laceration on his forehead. He also suffered injuries to his right leg and ribs.
7. The maximum outdoor temperature on August 2, 2006, was 98 degrees Fahrenheit. It is unclear from the evidence what the temperature was inside the furniture factory. *Page 4 
Plaintiff's testimony that the temperature inside the plant was 135-140 degrees is not accepted as credible. No other employees working for Defendant-Employer in the furniture factory had any heat related injuries on August 2, 2006. The inside work area was approximately the size of a football field and there were ceiling fans which circulated air and air returns in the area near where Plaintiff worked.
8. Plaintiff was taken to Catawba Valley Medical Center where he was initially treated in the emergency room by Dr. Eric Einfalt who is board certified in emergency medicine. Plaintiff told Dr. Einfalt that he had been fatigued for several days, he had been hospitalized the previous week for dehydration and he had been having diarrhea about three times a day for several days prior to August 2, 2006. Dr. Einfalt diagnosed Plaintiff with a syncopal episode, right forehead laceration, right leg contusion, dehydration and renal insufficiency. Plaintiff's head laceration required 14 stitches. He spent three days in the hospital recovering from his condition.
9. Dr. Einfalt was of the opinion that the heat from Plaintiff's work environment in and of itself probably would not have caused Plaintiff to pass out, but the heat may have played a role because it caused excess water loss, in addition to the diarrhea losses and other losses that his body was incurring because of an underlying illness. He could not opine to a reasonable degree of medical certainty that but for Plaintiff's renal insufficiency (a pre-existing underlying condition), he would not have passed out and fallen. Dr. Einfalt deferred to the opinions of Dr. Kaarianien on causation. With respect to disability, he testified that it was his opinion that but for the renal insufficiency, Plaintiff would have been able to return to work "within a week or so." *Page 5 
10. On August 2, 2006, Plaintiff was also treated at the hospital by Dr. Ismo Kaariainen, a board certified internist and nephrologist. Plaintiff reported having sustained a fall at work after suffering from increasing dizziness for about a day. Plaintiff's creatinine level, which measures kidney function, was significantly high and he had low blood pressure caused by dehydration. Dr Kaariainen opined that Plaintiff was dehydrated, which led to his low blood pressure and his kidney failure and that these conditions were exacerbated by his pre-existing diabetes.
11. Dr. Kaarianien opined to a reasonable degree of medical certainty that the temperature and lack of hydration caused Plaintiff's dehydration, which led to hypotension, and subsequently to renal failure and a syncopal episode. Dr. Kaariainen further testified that Plaintiff's work activities and work environment subjected him to a greater risk of dehydration than that to which he would have otherwise been exposed if he were not performing that job and a greater risk over that of the general public not so employed. On cross examination, Dr. Kaariainen testified that there probably was not anything specific to the work environment at Defendant-Employer's factory to which Plaintiff would be exposed that would be particularly causative, but on redirect he testified that it is fair to say that heat and sweating were particularly causative [of Plaintiff's dehydration].
12. Plaintiff was performing his normal work in the usual way when he passed out and fell. The relative heat in the work environment on the day of injury has not been proven to be out of the ordinary or unusual, considering Plaintiff's past work history in furniture plants, and his sixteen (16) summers in the Catawba County, North Carolina area. The work environment inside the factory was nothing new to this job or to Plaintiff, even if the outside heat was as much as 98 degrees at some point during that day. Plaintiff had already been working in *Page 6 
the summer heat for Defendant-Employer for many weeks by the date he fell. Also, Plaintiff had worked under similar conditions in furniture factories in the Newton, North Carolina area for much of the prior sixteen (16) years before this incident.
13. Ben Johnson, a co-employee, testified at the hearing of this matter that there were ceiling fans in the work area that generally helped keep the work environment cooler than it would be outside in the summer sun. The employees were also able to have water on the assembly line. Based upon the greater weight of the evidence, Plaintiff's failure to keep himself hydrated, however, was not due to a willful intent to injure himself.
14. Mr. Johnson had worked in the furniture industry for 44 years and he testified that August 2, 2006 was no hotter than the typical summer day within the factory. During Mr. Johnson's 44 years of work in the furniture industry he had not seen anyone pass out due to excessive heat. Mr. Johnson was aware that the Plaintiff had passed out at home approximately one week prior to this incident and had to be medically treated for dehydration. The Full Commission finds Mr. Johnson's testimony to be credible.
15. Plaintiff's testimony that he had to do the work of several people because several of his co-workers were absent is not found to be credible or supported by the employers' records.
16. Plaintiff's dehydration, which led to his fall, did not develop over a long time and did not develop due to the particular job duties he was performing. The evidence does not establish that Plaintiff's job duties increased the temperature of his work environment or that the workplace exposed him to artificially produced heat. Based upon the greater weight of all the evidence the Full Commission finds that Plaintiff's particular job duties did not cause his dehydration. The opinions of Dr. Kaarianien and Dr. Einfalt are not dispositive of the issue of compensability under either an injury by accident or occupational disease analysis. Little weight *Page 7 
is given to the opinion of Dr. Kaarianien that Plaintiff's job placed him at a greater risk of dehydration than that to which he would otherwise be exposed based upon all the evidence presented.
17. Plaintiff improved rapidly with treatment. Plaintiff was discharged after three days with instructions to maintain hydration, get treatment for his chronic pre-existing conditions and to check with the occupational nurse for clearance to return to work and for suture removal. Dr. Kaarianien did not expect the dehydration episode to have any lasting impact on Plaintiff's ability to work.
18. After his discharge from the hospital, the Plaintiff was notified by Defendant-Employer that his employment had been terminated.
19. Plaintiff continued to experience symptoms of dizziness, headaches, and general soreness. He returned to Catawba Valley Medical Center on August 17, 2006, where it was discovered that he was suffering from a previously undiagnosed left 9th anterior rib fracture. He was instructed to avoid strenuous activities and to change positions slowly. Plaintiff otherwise was medically able to work.
20. Plaintiff has not proven that his dehydration, which led to his passing out and falling, constituted an occupational disease. Plaintiff's condition developed over a very short period of time and was allegedly related to seasonal temperature changes, combined with his peculiar predisposition to dehydration as a result of his pre-existing underlying conditions, not his job duties. No weight is given to the opinion of Dr. Kaariainen that Plaintiff's job duties placed him at an increased risk of dehydration over that of the general public not so employed as it is not supported by the greater weight of the evidence, including some of the other testimony of Dr. Kaariainen himself. *Page 8 
21. Since being terminated by the Defendant-Employer, Plaintiff has been actively seeking a new job, but has been unsuccessful in securing suitable employment. Plaintiff received unemployment benefits in the amount of $98.00 per week from October of 2006 through mid-January, 2007.
22. Jimmie Link testified that the Plaintiff was on a 90-day probationary period of employment at the time of the August 2, 2006 episode. She also testified that Plaintiff was terminated due to being out of work for what Defendant-Employer believed to be a non-work related reason. At the time of his fall, Plaintiff had not earned any vacation or medical leave time off.
23. Plaintiff's average weekly wage was $320.00, yielding a compensation rate of $213.33.
 ***********
Based on the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The Plaintiff has failed to prove by the greater weight of the evidence that he sustained an injury by accident on August 2, 2006. N.C. Gen. Stat. § 97-2(6). The term accident requires the injury to be the result of some unusual or unexpected event or condition. Where the injury occurs while plaintiff is carrying out his usual and customary duties in his usual way, the injury does not arise by accident. Jackson v. HighwayCommission, 272 N.C. 697, 158 S.E.2d 865 (1968). However, when the injury is sustained through occupational exposure to heat or cold an exception to the traditional standard of proof for an injury by accident has been carved *Page 9 
out by Fields v. Plumbing Co., 224 N.C. 841, 32 S.E.2d 623 (1945;Dillingham v. Yeargin Construction Company, 320 N.C. 499, 358 S.E.2d 380
(1987).
2. In order for the Plaintiff herein to establish an injury by accident due to heat exposure, the following Fields test must be applied:
 . . . [W]here the employment subjects a workman to a special or particular hazard from the elements, such as excessive heat or cold, likely to produce sunstroke or freezing, death or disability resulting from such cause usually comes within the purview of the compensation acts. . . .The test is whether the employment subjects the workman to a greater hazard or risk than that to which he otherwise would be exposed. Fields v. Tompkins-Johnston Plumbing Co., at 224 N.C. 842-843, 32 S.E.2d 624 (1945).
3. Plaintiff's work did not increase the temperature of his work environment or subject him to a greater hazard or risk than that to which he would otherwise be exposed. Although the general outside temperature rose to 98 degrees on the day of his injury, there is insufficient evidence of record to establish that the heat inside of the Defendant-Employer's factory was unusual and out of the ordinary for the day in question. Also the evidence does not establish that Plaintiff's job duties added additional heat from an artificial source to his general work environment. The Supreme Court of North Carolina inFields held that the additional hazard created by the artificial heat generated from the hot lead the Plaintiff was using on an unusually hot day was the direct cause of the Plaintiff's death, thereby establishing an injury by accident. Fields at p. 843. In Dillingham the Supreme Court held that Plaintiff was exposed to an increased risk of sustaining a heat-related illness because the heavy radiation suit he was required to wear exposed him to a greater danger of overheating than that to which he would otherwise be subjected, establishing an injury by accident.Dillingham v. Yeargin Construction Company, 320 N.C. 499, 358 S.E.2d 380
(1987). A similar analysis was done by the Court of Appeals in finding Plaintiff sustained a heat-related injury by accident, resulting in a *Page 10 
compensable heart attack in Madison, even though Plaintiff had a pre-existing heart condition. Madison v. International Paper Co., 165 N.C.App. 144, 598 S.E.2d 196 (2004).
4. The facts herein are not analogous to those in Fields, Dillingham orMadison since Plaintiff was not exposed to increased heat from an artificial source along with the hot seasonal temperature. Additionally, Plaintiff was doing his usual and normal work in his usual way when he experienced a syncopal episode due to dehydration and fell down, while in the process of wiping down furniture. Plaintiff has not proven that the work environment was unusual or out of the ordinary, either for Plaintiff's work history in furniture plants, nor for his sixteen (16) summers in the Catawba County, North Carolina area. Plaintiff had already been working in the summer heat for many weeks by the date he fell. Also, Plaintiff had worked in furniture factories in the Newton, North Carolina area for much of the past sixteen (16) years before this incident. The work environment inside was nothing new to this job or to Plaintiff, even if the outside heat was as much as 98 degrees Fahrenheit at some point during that day. Plaintiff's testimony that the work area was 135 to 140 degrees has not been found to be credible. Also, Mr. Johnson, a co-worker whose testimony has been found to be credible, worked in furniture factory finishing rooms for over 44 years, the most recent seven (7) years were at Defendant-Employer's factory. During the time period he worked for Defendant-Employer and elsewhere, he worked in exactly the sort of summer working conditions that Plaintiff faced and no one else had passed out from heat related causes. Plaintiff's work area was hot, but not as hot as the outdoor temperature due to the presence of ceiling fans and air returns in the factory near the area where Plaintiff worked. Therefore, the heat faced by Plaintiff at the time of his injury was not unusual or out of the ordinary. *Page 11 
5. The Plaintiff has failed to prove by the greater weight of the evidence that he sustained an occupational disease on August 2, 2006. The causative origin of Plaintiff's condition does not fit within the definition of an occupational disease. Plaintiff's condition developed over a very short period of time and was related in part to seasonal temperature changes, combined with his peculiar predisposition to dehydration due to pre-existing, underlying conditions, not his job duties. N.C. Gen. Stat. § 97-52, Henry v. A.C. Lawrence Leather Co.,234 N.C. 126, 66 S.E.2d 693 (1951).
4. Under N.C. Gen. Stat. § 97-53(13), any non-enumerated disease may be found to be an "occupational disease" if an employee can prove that the condition was "due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment." A disease is "characteristic" of a line of employment when there is a recognizable link between the nature of the job and an increased risk of contracting the disease in question. Booker v. Duke Medical Ctr., 297 N.C. 458, 256 S.E.2d 189
(1979). Plaintiff's dehydration, which led to his fall, is not characteristic of or peculiar to his work duties of wiping down furniture, even in hot conditions during the summer. Plaintiff's had multiple risk factors for dehydration, which led to his passing out and falling, including diabetes, diarrhea and other underlying conditions that contributed to his bodily water loss. The Full Commission gives no weight to Dr. Kaarianen's opinion that the Plaintiff was subjected to a greater risk of dehydration as opposed to the general public not so employed. Plaintiff was at no greater risk of dehydration than many other workers in many other employments in his community, whether inside or outside, where the workplace was not air-conditioned. N.C. Gen. Stat. §§97-2(6); 97-53(13). Booker v. Duke Medical Ctr., 297 N.C. 458,256 S.E.2d 189 (1979). *Page 12 
5. Defendants have not proven Plaintiff intentionally tried to injure himself. Plaintiff's claim would not be barred under N.C. Gen. Stat. § 97-12(3).
 ***********
Based on the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim under the law must be and is hereby DENIED.
2. Each side shall bear its own costs.
This the ___ day of July, 2008.
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ PAMELA YOUNG CHAIR
 S/_______________ BUCK LATTIMORE COMMISSIONER *Page 1